ALBANY,
August, 1820.

WHITNEY
v.
N. Y. FIREMEN
INS. CO.

# WHITNEY *against* THE NEW-YORK FIREMEN INSURANCE COMPANY.

*Insurance on freight from Archangel, in Russia, to New-York. During the voyage the ship became so shattered and disabled by storms, that she was compelled to seek a port for safety, and put into the Helder, being a port of necessity; where, on a survey, she was found to be so damaged, as to be unseaworthy and incapable of being repaired, unless at an expense much exceeding half her value: and though another vessel might easily have been procured at Amsterdam, at a moderate freight, to carry an ordinary cargo to New-York; yet the hemp being so much wet and damaged, as to render it wholly unfit, if not dangerous, to be re-shipped in another vessel, even if any master would have been willing to carry a cargo in such state, the voyage was, therefore, broken up; and the vessel and cargo sold at the Helder, for the*

THIS was an action on a policy of insurance upon the *freight* of the ship *Samuel Whitney*, W. E. *Whitney*, master, on a voyage from *Archangel* to *New-York*, dated *November* 22, 1815. The policy was valued, and the sum insured was 8,000 dollars, at a premium of three and a half per cent. The cause was tried before Mr. Justice *Yates*, at the *New-York* Sittings, in *April*, 1819.

The ship sailed on her voyage from *Archangel*, on the 21st of *August*, 1815, with a cargo consisting of hemp, linens, sail cloth, glassware and iron. From the 13th of *September* to the 5th of *October*, 1815, the ship encountered a succession of sudden squalls, heavy gales, and violent storms, in which she was much shattered and damaged, and became leaky, so that it became necessary for the general safety to lighten the ship, and after consultation with the officers and crew, 51 packages of linen, 83 packages of sail cloth, and 16 boxes of glass, were thrown overboard ; and it was determined to seek some port. After experiencing violent head winds and incessant gales, until the 28th of *October*, they found themselves north of the *Texel*, which they entered on the 30th of *September*, and anchored at the *Niewe Diepe*, about 18 *Dutch* miles from *Amsterdam*. At the request of the captain, who was also part owner, a survey was made of the ship at the *Helder*. The report of the survey was made about the 18th of *November*, and the cargo was unladen, and a second survey made about the 12th of *December*. The vessel was found to be a complete wreck, and so much damaged, as not to be worth repairing, and if all the money at which the damages were estimated, had been expended in repairs, it would not have rendered her sea-worthy. The

*benefit of all concerned. The assured abandoned as for a total loss. Held, that the assured had a right to abandon, and to recover for a total loss, deducting freight, pro rata itineris, from Archangel to the Helder.*

whole cargo was wet and damaged; and part of the hemp rotten. The surveyors reported it to be in such a heated state as to be wholly unfit to be reshipped; and to prevent further loss, they recommended that both ship and cargo should be immediately sold at public auction, for the benefit of the concerned. The ship and cargo were accordingly sold at auction under the direction of the captain, who received the net proceeds at the *Helder*. It appeared that it was customary for ships to lie at the *Helder*, between which and *Amsterdam* there is a constant communication; and that the *Samuel Whitney*, or a ship of her size, could not have gone to *Amsterdam* before *March* or *April*, 1816.

It appeared that another ship might have been easily procured at *Amsterdam*, to carry an ordinary cargo from the *Helder* to *New-York*, at a low freight; but that no attempt was made to hire another vessel; and it was proved that the hemp was so thoroughly wet, that, at that season of the year, when there is almost continual rain and sleet, the hemp could not have been dried in the open air, so as to be in a proper condition for reshipping. Several masters of vessels who were examined as witnesses, agreed that no prudent man would consent to take a cargo of wet hemp on board of his ship, for such a voyage; that it was very liable to become heated and take fire; that the hemp was in a perishing state, and could not have been dried until the ensuing spring.

The *ship* and *cargo* were, also, insured by separate policies. The vessel and *freight* were abandoned, and a total loss was paid by the insurers on the vessel, after deducting the net proceeds, arising from her sale, received by the plaintiff: The *cargo* was not abandoned; but the loss was adjusted and paid, and the defendants, who were insurers of a part, settled with the plaintiff according to such adjustment.

A verdict was taken for the plaintiff, for 9,589 dollars and 77 cents, being the whole amount of the value insured, with interest, subject to the opinion of the Court, on a case containing the above facts, and which either party was to be at liberty to turn into a bill of exceptions, or a special verdict; and in case the Court should be of opinion that the plaintiff was entitled to recover on the ground of a *pro rata*

ALBANY,
August, 1820.

WHITNEY
v.
N. Y. FIREMEN
INS. CO.

freight, and any difficulty should arise as to the amount to be recovered, the same should be referred to Mr. *Johnson*, to ascertain and settle the amount.

*Wells*, for plaintiff.

S. *Jones*, jun. contra.

PLATT, J. delivered the opinion of the Court. To sustain such an action on a policy for freight, the plaintiff must prove, that the ship was disabled by the perils insured against ; and that the cargo could not have been carried from the port of *necessity* to the port of *destination*, for one *half the freight valued in the policy*. The rule is now perfectly established, that a policy on freight does not insure the *soundness* of the goods, but merely their safe carriage to the port of destination. It is immaterial to the insurers whether the cargo arrive in good, or in bad condition, provided the goods *specifically remain*. If they perish from internal causes of decay, or are spoiled by reason of the perils of the sea ; still, if they are carried to the port of destination, and are ready to be delivered there, or if the master is able, and offers to carry them, but the owner of the goods voluntarily elects to receive them at an intermediate place, the ship owner is entitled to his full freight, although the goods are of no value to the shipper. (*Herbert* v. *Hallett*, 3 Johns. Cases, 93. *Griswold* v. *New-York Insurance Company*, 3 *Johns. Rep.* 321. *Saltus* v. *Ocean Insurance Company*, 14 *Johns. Rep.* 138.) If reasonably practicable, it was undoubtedly the duty of the master, as agent for the ship-owners, to have procured another vessel to carry the cargo from the *Helder* to *New-York*. He was bound to earn the whole freight, if he could ; and in case of disaster, it was not an essential part of the contract of insurance on freight, that the goods should be transported in that particular ship. (*Bradhurst* v. *Col. Ins. Co.* 9 *Johns. Rep.* 17.)

Whether *Amsterdam* and the *Helder* are to be regarded as the same port, so as to oblige the master to resort to *Amsterdam*, to find a vessel to complete the voyage, has been strenuously contested by the counsel. Considering the re-

ALBANY,
August, 1820.

WHITNEY
v
N. Y. FIREMEN
INS. CO.

lative position of those two places, and their intimate commercial connexion, on the same arm of the sea; I incline to the opinion, that if the master was bound to seek another ship to continue the voyage, his duty required him to resort to *Amsterdam* for that purpose, if none could be procured at the *Helder*. In *Saltus* v. *Ocean Ins. Co.* (12 *Johns. Rep.* 107.) it was held, that the master, under like circumstances, was not bound to go from *Kinsale* to *Cork*, (15 miles) to hire another vessel. Extreme cases often embarrass us, in the application of any rule; but, I think, a well founded distinction exists between the two cases; because, between *Kinsale* and *Cork*, there is *mare apertum*, and between the *Helder* and *Amsterdam*, it is *mare clausum*.

But, in this case, I am of opinion, that it is proved, to a reasonable certainty, that the master could neither dry the hemp, nor re-ship it for *New-York*, on board another vessel, in the wet and perishing condition in which it was. *Brown* and *Tillinghast*, two masters, swear, that they would not have taken the wet hemp on board their vessels, and that there was probable danger of it's setting fire to the ship; and, in their opinion, no prudent master of a vessel would take such a cargo on board. This opinion, of men so competent to judge, and according so perfectly with the common sense, and obvious reason of the case, seems to me abundantly sufficient to establish the fact, that any attempt to charter a vessel to carry a cargo in such a state across the *Atlantic*, would have been unsuccessful. Suppose there was no ground to apprehend danger of *ignition;* what ship-owner, for treble freight, would expose his vessel, and every person having connexion with it, to the pestilential effluvia of a cargo of rotten hemp? If private interest were not sufficient to restrain men from making such a shipment, it ought to be punished as an offence against the public safety. I assume, then, that without any fault or neglect of duty in the master, the ship was rendered unseaworthy by the perils of the sea; that she entered the *Helder* as a port of real necessity; that she could not be repaired for half her value; and that another vessel could not be procured to carry the cargo to the port of destination, for one half the freight as valued in the policy. The plaintiff had a right,

ALBANY,       therefore, to break up the voyage, and to abandon the
August, 1820.  freight to the underwriters, as for a total loss.    But I think
THE PEOPLE    it equally clear, that the defendants are entitled to a deduc-
v.            tion for freight *pro rata itineris*, upon the whole cargo (in-
M'KAY.        cluding the *Jettison*) from *Archangel* to the *Helder*.    The
owner of the cargo did not abandon to the underwriters, as
he had a right to do, but chose to settle with them, on the
principle of a *partial loss*.    He, accordingly, by his super-
cargo, directed the sale at the port of necessity, and re-
ceived the net proceeds *there*, as owner of the cargo.    By
such a course of conduct, the transaction is characterized
as a *partial*, not a *technical total loss* of the cargo.    And
the shipper, having chosen to receive his goods, or the avails
of them, in *Holland*, it presents a case in which the ship
has earned *pro rata* freight.    (*Williams* v. *Smith*, 2 *Caines'*
*Rep.* 13.    *Robinson* v. *Marine Ins. Co.* 2 *Johns. Rep.* 323.
*Bradhurst* v. *Col. Ins. Co.* 9 *Johns. Rep.* 17.    *Schiefflin* v.
*N. Y. Ins. Co.* 9 *Johns. Rep.* 21.)

A reference must, therefore, be made to settle the
amount of the recovery, pursuant to the stipulation in the
case.

Judgment for the plaintiff accordingly.