THOMAS H. BOARDMAN & another *vs.* BOSTON MARINE INSURANCE COMPANY.

Suffolk. January 20, 1888. — March 12, 1888.

Present : MORTON, C. J., DEVENS, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Marine Insurance — Freight — Abandonment — Total Loss — Cargo — Evidence.*

A loss of more than half a cargo of coal *in specie* by perils insured against author-izes the abandonment and a claim for a total loss of freight, insured under a valued policy, though the actual freight lost and the cost of forwarding the cargo left is less than one half the valued freight.

In an action on such a policy upon freight on a cargo of two hundred and seventy-four tons of coal, also insured by the defendant, there was evidence that the de-fendant had paid the owners of the cargo as for a total loss; that forty or fifty tons were thrown overboard to save the vessel; that "great seas" washed some coal out of her; that thirty to forty-five tons were lightered; that a "very little" was used by the steam pumps of a wrecking company; and that she was not further discharged until she reached a port, where forty tons remaining were taken out of her. *Held*, that a jury would be warranted in finding that more than half the cargo was lost by perils insured against.

CONTRACT upon a policy of insurance on freight of the schooner Theresa. Trial in the Superior Court, before *Brigham*, C. J., who reported the case for the determination of this court, which, so far as material, was as follows.

The policy, which was taken out by the plaintiffs, who were the owners of three fourths of the vessel, for the benefit of all the owners, was for " twenty-five hundred dollars on freight on board or not on board sch. ' Theresa,' from September 19th, 1885, to September 18th, 1886, both days inclusive, . . . . freight valued at $2,500 unless a larger amount at risk, then at actual freight," and contained the following printed clauses, the blank used being that habitually used by the defendant for policies on vessels or freights :

" It is further provided that the insurers shall not be liable . . . . for any loss of freight on ice or lime, unless the entire quantity shipped shall be destroyed because of stranding, sink-ing, or fire; nor for any loss of ice in general average except it be occasioned by jettison, and in all cases of loss by jettison the same shall be settled on the principle of general average only, but shall not be liable for general average, or general contribu-

tion, in case of the jettison of the deck load.  And in case of claim for loss or damage, there shall be deducted from the cost of metal, sheathing, calking under the metal or sheathing, and docking, first the value of the old metals and nails, and from the remainder two and a half per cent for each month that the metal or sheathing shall have been on said vessel when the same is taken off, and if it has been on three years, the cost shall be wholly borne by the insured; and from all other repairs, except upon anchors, there shall be deducted one third.  And it is agreed, that the insured shall not have the right to claim for total loss on account of the estimated amount of repairs exceeding the valuation of the vessel, nor under any circumstances to abandon, provided the vessel remain *in specie*, unless the amount which the insurers would be liable to pay (exclusive of all general average charges, and charges for getting off or raising and bringing into port a vessel stranded or submerged, and of all repairs consequent upon decay) under an adjustment, as of partial loss, after making all the usual deductions, including the proportion or whole of cost of remetalling, docking, and calking, as provided for in this policy, shall exceed half the value of said vessel, as declared in this policy; and the highest valuation under which the vessel is insured, in any policy, shall be the basis for ascertaining a technical total loss of freight under this policy.  It is also agreed that the assured shall not have the right to abandon, or to claim total loss of, freight upon goods perishable in their own nature, unless the vessel carrying said goods shall be actually or technically a total loss according to the terms of this policy, or the goods themselves be totally lost caused by sinking, stranding, burning or collision with another vessel.  It is also further agreed that voyage policies on freight on board or not on board shall attach at the first port specified, as soon as the inward cargo is landed, and no sooner, whether the vessel be under charter or not, and shall terminate at port or ports of destination with the landing of cargo, in proportion as amount hereby insured bears to full amount of freight or charter for the whole voyage insured.  Time risks on freight shall attach and terminate in the same manner, applying to each cargo (or voyage, if in ballast and not chartered) successively, or to each charter successively in case vessel be chartered."

The vessel was insured by three policies in companies other than the defendant, the valuation in each policy being $8,000. On December 22, 1885, the schooner sailed from Philadelphia for Newburyport with a cargo of two hundred and seventy-four tons of coal, at a freight of $1.90 per ton, including discharging, or $1.65 per ton without. The cargo was insured by the defendant for the consignees, who were the owners.

While on this voyage the schooner, on January 5, 1886, in a heavy gale, dragged both anchors, and went ashore on a bar near Hyannis. On the same day an ineffectual attempt was made by wreckers to get the vessel off, and on January 7 a further attempt was made by the Boston Tow-Boat Company under a contract, but on January 9 a violent gale compelled the company to leave her and abandon the contract, under the belief that she was going to pieces. On January 9 the owners of the cargo abandoned it to the defendant, and on January 16 the defendant, having at first declined to accept the abandonment, paid them in full, as for a total loss of the cargo. The plaintiffs on January 10 abandoned the vessel to the insurers, who, after declining to accept the abandonment, paid them in full, as for a total loss under their policies. On the same day the plaintiffs by telegram also abandoned the freight to the defendant, and confirmed their abandonment of it by letters on January 11 and 12; but the defendant replied, " In absence of proof of the loss, we decline to accept the abandonment."

On January 21 another contract was made by the underwriters, on vessel and freight, with the Boston Tow-Boat Company, to get the vessel and cargo off, and deliver them at Hyannis, and on February 3 the company succeeded in bringing her into the harbor of Hyannis, with some part of her cargo remaining on board. She was brought in full of water, and, after going in as far as she could go, was left on the bottom. On February 4, 1886, the defendant, after paying the owners of the coal as for a total loss, wrote the plaintiffs a letter, signed by its vice-president, as follows: " As the coal is full of sand, it will not pay to bring it to destination. If I abandon it to you for its frt., you would not get full frt. for it. In order to stop expense on it, I am willing to take it at Hyannis, if you will make a proper reduction of frt. What will you take off, and have

voyage end where she is?" To which letter the plaintiffs replied, on February 6, 1886 : "We are in receipt of your favor of 4th inst. In the matter of sch. Theresa and her cargo, as we do not consider ourselves the owners of the vessel, having, upon January 11th, abandoned her and her freight to the underwriters, you will see the impropriety of our discussing with you the question of what shall be done with vessel or her cargo."

On the same day the defendant wrote to the owners of the cargo, "Please send me the B–L of the coal, as I propose to sell it; the buyer will require it." The owners thereupon sent the defendant the bill of lading, as requested. On March 15, 1886, the vessel, the cargo having been first removed from her, was taken to New Bedford for repairs, and afterwards sold by the insurers.

A shipbroker testified : "A fair coal freight from Hyannis to New Bedford for the cargo of the Theresa, supposing the vessel not to be under water, and the cargo to be at the port of Hyannis, knowing what I do about it, would be — I should have wanted something like $2.25 a ton. I am figuring this coal in good condition. I suppose it would cost 25 cents a ton for loading it from the wharf, 6 cents for trimming, and 25 cents for discharging, and this is included in the $2.25." On cross-examination he testified : "The lowest rate of freight in January would be $2.25, whether a vessel was already at Hyannis or sent there. The danger of season makes that rate. In the summer I think it could be carried at the ordinary rate, $1.25."

Lincoln F. Baker testified : "I was the wreck-master for the Boston Tow-Boat Company. Have been in that business six years, and had experience in the wrecking of vessels. I first heard of this wreck at Boston, January 5. I telegraphed to the Storm King, our tug-boat, then at Wood's Holl, to proceed to the wreck immediately with our steam lighter. I went to the wreck on the morning of the 7th, met Mr. Boardman, the owner, and made the contract with him for $2,000 to deliver vessel at Vineyard Harbor or New Bedford; no success, no pay. I hired some men ashore, not having sufficient men aboard, and went on board the schooner at once; we hauled the lighter alongside; the steam pumps were already aboard the lighter; the Storm King lay alongside the lighter. We put the steam pump down

the fore hatch; that was the only place it was valuable, the main hatch being full of coal. Immediately after making fast, in the afternoon of the 7th, we started the pump and began to throw coal overboard. We threw the coal over from the main hatch; this was done to lighten the vessel as fast as possible. We worked till towards midnight on the 7th, and again on the morning of the 8th. It was impossible to keep the main pump down in the main hatch till we took out coal enough to let the suction pipe go down. The first of this coal we threw overboard. In the morning of the 8th, we began to put coal on the lighter's deck; about noon we placed the second pump alongside down the main hatch and started both pumps together. We kept at work on the coal till one or two o'clock, and it being then high water we made an attempt to haul the vessel off; this was one or two o'clock of the night of January 8. We had a couple of cables to the Storm King, about one hundred and fifty fathoms, and with them tried to haul her off; found she was imbedded in the sand; it was impossible to start her. The Storm King hauled off again, and the lighter hauled alongside the Storm King to give her some of the coal on the lighter's deck. The lighter was then brought back alongside the schooner. We went to work immediately throwing coal overboard. We continued at work till about ten o'clock at night, so as to allow the suction pipe of the pump to suck the water. At 10 P. M. the wind from east-northeast had freshened to a violent storm.

" When it broke daylight, some of the men were on deck and some hanging to the weather rail, taking the seas as they broke over them on their hands and knees. It was impossible to do anything; the surf was so bad that the men on shore couldn't get to us. Two men volunteered to get into the dory. They got ashore. We hauled up the surf-boat and dropped into it from the main boom, and rowed to the lighter. . . . . On Sunday, January 10, A. M., the Storm King towed us to Hyannis. We had been out ever since the 7th. The storm was the most severe I ever saw. As soon as I arrived at Hyannis I notified the master that I would have nothing further to do with the vessel. I did this because I didn't consider her of any value whatever. Her forward house was gone, her cabin washed out,

and I supposed her port bilge was entirely stove in.  I did not think I could save vessel or cargo at that time.  During the gale our pumps and things listed to the leeward.  This soft coal was very light, and great seas breaking over the deck would put the coal in motion, and it would go down in the lee waist.  It would go overboard; the bulwarks were knocked out.  I should think we threw overboard forty or fifty tons of the coal.  Thirty or thirty-five tons, in my judgment, was taken aboard the lighter. From what was put on the lighter we coaled the Storm King during the first part of the storm.  This was necessary.  As a matter of judgment, fifteen or twenty tons were put on the Storm King.  Perhaps ten tons were thrown over from the lighter.  We had some ten or fifteen tons aboard the lighter when we reached Hyannis.  I don't think I could give any estimate how much of the cargo was washed out of her, because the vessel was carried entirely under water, so that during the gale and shifting of the cargo it would be impossible for me to tell much about it.  There was sand in the hold of the vessel, because we pumped sand up from the fore hatch through our pumps.  The coal was mixed with sand.  After I got to Hyannis Harbor, I reported to the captain, abandoned the cargo, and told him that I was through with the contract. . . . .  When I got to Boston I notified the general manager of the Tow-Boat Company that I was done with the Theresa ; that I did n't think there was sufficient vessel to save.  After that he made a contract himself, under which I made a further attempt to save her. . . . .  On February 3 we hauled her to Hyannis Harbor.  We carried her in full of water.  She went as far in as she could go, and remained there, on the bottom.  I left her so and went home.  I did not return to her till March 12.  On that day she lay alongside the pier at Hyannis, nearly filled with water.  She had coal in her then.  I took it out; I took out about forty tons, I judged.  After that I patched her bottom and carried her to New Bedford, delivering her there March 15, something more than two months after she was wrecked.  I don't think it would have been possible to discharge the coal from the schooner at the place where she was ashore, unless by using the pontoons as we did.  The expense per day of the boilers, lighters, pontoons, steam pumps, steam tugs, and men would have been rising $400

per day. To discharge the cargo we should have to lift the vessel and take her somewhere. It would take three days to lift her, and I think it would have taken five days to lift her to take her somewhere and discharge the cargo, the best we could have done."

On cross-examination he testified: "I did n't see the vessel out of water at New Bedford, but there was an inspection made by divers. They found her keel gone and garboard seam next the keel all open. . . . . The coal thrown over January 7 was from the main hatch. During the 7th and 8th I judge forty or fifty tons were thrown over; that is merely my judgment and guess-work. At the same time we filled the lighter twice. We put on thirty to thirty-five tons; out of that we put fifteen or twenty tons aboard the Storm King. We then filled up the lighter again from the Theresa, and in going into Hyannis had to throw over part of the load to save her, I should think from eight to ten tons; about sixteen tons got to Hyannis on the lighter. I can't estimate how much coal washed out through the bulwarks; it would be impossible. This soft coal, being very fine, went through the pumps. What fell through the hatch was piled up on the leeward side; it was washed up out of the hatch, and caught up by the bulwark on the lee side. I judge some of it must have gone out through the places in the bulwark. There was no breaking in of the vessel below the deck; it was above the deck. The quantity lost in this way could n't be very little; I don't know whether more than two or three tons. I did not see any go overboard through these places in the bulwarks, for the simple reason that the vessel was entirely submerged. . . . .

"The whole quantity of coal taken out on the lighters and the Storm King was forty-five tons, about, when we left the vessel on the 10th. We shovelled overboard forty or fifty tons, to the best of my judgment. I don't know how much coal washed out of her, or how much remained in the vessel. I don't know whether any went out through the bottom; possibly the fine coal might have gone out in the seam. Nothing but fine coal. Getting her into Hyannis after the 23d involved no removal of coal. What coal there was we lifted up with the pontoons in the vessel, except what little was used by the steam pumps, —

very little; they would not use over a ton a day for each pump if we drive them steady. We had been using that on the 8th, 9th, and 10th. We were out there January 30 and February 1 and 2. While taking the vessel into Hyannis, or on the 23d, I had not in mind at all how much coal remained on board the vessel. You could see, by looking down the main hatch, some coal there; the hole I dug with the steam pump was levelled up. I left her then. The next time I came there, March 12, she was alongside of the wharf. She was not discharged of coal before I got there the 12th; she was filled full of water. Between February 3 and March 12, I don't know whether any coal was taken out of her; somebody else .was in charge. We had three steamboats there; whether they used any of it I can't tell. I estimate forty tons remaining in her, March 12, merely from the coal piled up on the wharf. There was no measurement. It was taken out of the vessel, March 12."

On re-direct examination to the question, "Now don't you believe that under the circumstances that that vessel lay in there, with a storm of two or three days, her hatches open, water in amongst her cargo, and the waves breaking over her, that that cargo was extensively washed out?" he replied, "Well, the cargo was in motion, no doubt"; and to the further question, "Don't you believe that her cargo of light, soft coal, in the condition that that was, with her hatches open, would wash out under those circumstances?" he replied, "I don't think I am hardly competent to answer that, because in my experience I don't ever have chances to take observations. There is no question that some of the coal came out of the hatch. In the subsequent storms after January 10, there would not be the same chances for the cargo to wash out; not so much, because this was a tremendous gale of wind. We never have such seas as on that night. She never righted a foot while we were there; she lay at an angle of about forty-five degrees. On the 23d the water was running into her hatch, and had been ever since the 10th. It depends on the motion what effect that would have on the soft coal. I could n't tell how far below deck the coal was as I looked down the hatch. She still had some list to port as we took her into Hyannis. I could see into the hold and see coal there, but could not tell how far below deck it was. It was levelled off;

the sea did that; it carried the same list the vessel did. I could not judge, looking through the hatch, what portion of the cargo remained after arriving at Hyannis."

The defendant asked the judge to rule that the plaintiffs upon the evidence were not justified in abandoning the freight insured, and could not recover as for a total loss of the freight under the policy. The judge refused so to rule, ordered a verdict for the plaintiffs as for a total loss, and reported the case for the determination of this court. If the plaintiffs were entitled to recover as for a total loss, the verdict was to stand; if the plaintiffs were entitled to a partial loss only, a new trial was to be ordered.

*W. E. Russell,* (*C. T. Russell* with him,) for the plaintiffs, contended that there was a total loss of freight; 1. by the actual or constructive loss of the vessel, or of her voyage, within the terms of the policy; 2. by the actual or constructive total loss of cargo; or 3. either by loss of the voyage, the expense of forwarding cargo, the delay, impossibility, or uselessness of so doing, or any facts showing that the assured had actually lost more than one half of the freight.

*F. Dodge,* for the defendant.

HOLMES, J. This is an action upon a policy of insurance on freight on board or not on board schooner Theresa for one year. The freight is "valued at twenty-five hundred dollars, unless a larger amount at risk, then at actual freight"; and the policy provides that time risks on freight shall apply "to each cargo (or voyage, if in ballast and not chartered) successively, or to each charter successively in case vessel be chartered." *Thwing* v. *Washington Ins. Co.* 10 Gray, 443, 453. The only question is, whether the court erred in refusing to rule that upon the evidence the plaintiffs could not recover for a total loss.

The defendant's main reliance is upon the following clause in the policy: "And it is agreed, that the insured shall not have the right to claim for total loss on account of the estimated amount of repairs exceeding the valuation of the vessel, nor under any circumstances to abandon, provided the vessel remain *in specie,* unless the amount which the insurers would be liable to pay (exclusive of all general average charges, and charges for getting off or raising and bringing into port a vessel stranded or submerged, and of all repairs consequent upon decay) under an

adjustment, as of partial loss, after making all the usual deductions, including the proportion or whole of cost of remetalling, docking, and calking, as provided for in this policy, shall exceed half the value of said vessel, as declared in this policy; and the highest valuation under which the vessel is insured, in any policy, shall be the basis for ascertaining a technical total loss of freight under this policy." The defendant contends that all parts of this clause apply to insurance on freight, and limit the right to abandon it to the case there expressed.

We have not found it necessary to consider whether this clause in any way limits the right to claim for a total loss of freight, except to provide that when the claim is based upon a constructive total loss and abandonment of the vessel as the foundation, the value of the vessel is to be taken at the highest valuation in any policy, and then to leave the question to be determined as in *Ellicott* v. *Alliance Ins. Co.* 14 Gray, 318, 320, so far as the defendant is concerned. For even if we should follow the plaintiff's argument to that extent, still it would be impossible to make out a total loss of freight on this footing consistently with the statement in *Thwing* v. *Washington Ins. Co.* 10 Gray, 443, 457, 458, — that where the cargo can be forwarded at a cost of less than half the stipulated freight, there is no total loss, — if in a case like the present the freight is to be taken at the valuation in the policy for the purpose of determining that question. *Thwing* v. *Washington Ins. Co.* at p. 461. *Whitney* v. *New York Firemen's Ins. Co.* 18 Johns. 208, 210. *Allen* v. *Commercial Ins. Co.* 1 Gray, 154, 157.

But we think it too plain for argument, that, whatever its scope, the clause does not extend beyond the case where the claim for a total loss of freight is based upon the loss of the ship. It has no application where the claim is based upon the loss of the cargo. If it did apply to a claim on the latter ground, it would do so simply in the sense of excluding it altogether. But nothing of that sort is intended, as the next sentence regulates a claim for freight based upon loss of perishable goods, and an earlier one deals with loss of freight on ice or lime caused by destruction of those articles.

The plaintiff claims on the ground of the loss of cargo *in specie* by perils of the seas, as well as on that of the loss of the ship.

The whole cargo, which consisted of two hundred and seventy-four tons of coal, was not lost. The whole actual freight was only five hundred and twenty dollars and sixty cents, or much less than half the valuation in the policy. If, therefore, we are to follow the rule which has been applied in this Commonwealth for the purpose of determining whether there is a constructive total loss of a ship under a valued policy, there has been no constructive total loss of freight, and there could not be so long as a single ton remained which could be forwarded for less than about seven hundred and thirty-two dollars, or half the valued freight less the actual freight supposed to be lost. We have no disposition to depart from the rule so far as it is settled, but in the existing state of the decisions elsewhere it should not be extended. *Bradlie* v. *Maryland Ins. Co.* 12 Pet. 378, 398, 399. *Irving* v. *Manning*, 1 H. L. Cas. 287, 306. *Stewart* v. *Greenock Ins. Co.* 6 Ct. of Sess. Cas. (2d series) 359. Phillips, Ins. § 1539. It is to be noted that in *Allen* v. *Commercial Ins. Co.* 1 Gray, 154, 157, while the rule is adhered to, some stress is laid upon the fact that it was embodied in the words of the policy before the court, as is usual in Boston. Phillips, Ins. § 1539, n. It is to be noticed further, that the reasons offered in *Deblois* v. *Ocean Ins. Co.* 16 Pick. 303, 312, other than that abandonments for technical total losses are not to be favored, have no application here. The actual value of the vessel will fluctuate, according to the time when and place where the loss occurs. Furthermore, it is a matter of estimate, on which opinions may differ widely. It may well be said that such estimates are excluded by the agreement of the parties, and that, as the only way of ascertaining whether the loss is more than half is by comparing the cost of repairs with some valuation, the valuation in the policy must be accepted.

But in the case at bar there is no element of fluctuation or of valuation. If the freight of a whole homogeneous cargo is conclusively presumed to be worth the valuation in the policy, there seems to be no reason why the freight of one half of it should not be presumed to be worth one half of that valuation. A loss of one half of the cargo *in specie* by perils of the seas entails a loss of one half of the actual freight, and the policy establishes that that freight is worth twenty-five hundred dollars. In any case

of loss of freight by loss of cargo, the question whether the loss is total can be determined by the simple rule of three. There being no question of fraud, or suggestion that the ship did not take a full cargo, or at least all that she could get, (*Coolidge* v. *Gloucester Ins. Co.* 15 Mass. 341, 344,) we are of opinion that a loss of more than half the cargo *in specie* by the perils insured against authorized the plaintiffs to abandon the freight, and claim for a total loss. See *Denoon* v. *Home & Colonial Ass. Co.* L. R. 7 C. P. 341, 351. *Clark* v. *United Ins. Co.* 7 Mass. 365, 373. *Fay* v. *Alliance Ins. Co.* 16 Gray, 455, 459.

We are also of opinion that there was evidence from which the jury would have been warranted in finding that there was such a loss of more than half the cargo. We do not say that they might not have found otherwise, but as the defendant did not wish to go to the jury after the court had declined to take the case from them by a ruling in its favor, we have nothing to do with that possibility.

The total amount of coal was two hundred and seventy-four tons, one half of which is one hundred and thirty-seven. The witness Baker estimated that on March 12 he took forty tons out of the vessel at Hyannis, the port to which she was taken when raised. It is true that he says he does not know whether any coal was taken out between February 3, the day of arrival, and March 12, when he got there. But plainly he means merely that he does not know by the direct evidence of his senses ; for he also says, " She was not discharged of coal before I got there, the 12th ; she was filled full of water." So that it is a fair inference from what he saw, that no coal was taken out before. Baker further estimates that they threw over forty or fifty tons in a vain effort to save the vessel, which was abandoned, and that there were put on board the lighter thirty or thirty-five tons ; in another place he says forty-five, of which ten or fifteen tons reached Hyannis, and the rest was used or thrown overboard. The coal was very light, and the great seas washed it out of the vessel, but he could not say how much. Giving the defendant the benefit of all the above amounts, (see *Forbes* v. *Manufacturers' Ins. Co.* 1 Gray, 371, and *Griswold* v. *Union Ins. Co.* 3 Blatchf. C. C. 231,) and of the highest figures stated, they are only one hundred and thirty-five tons, or less than half, unless the " very

little " used by the steam pumps is to be added, and exceeded two tons, and the fair inference is that the rest was lost by perils of the sea. The only reason for doubt is in the vagueness of Baker's estimates. But they seem to have been the best evidence to be had under the circumstances, and the jury would have been warranted in accepting them, and would have accepted them perhaps the more readily in view of the fact that the defendant paid the owners of the cargo for a total loss. If then the jury had inferred that the coal not accounted for by Baker was lost by the perils insured against, and that it amounted to more than half the cargo, the verdict could not have been set aside as not warranted by the evidence.        *Verdict to stand.*